| | |
|---|---|
| **VICKI L. BUCCIERE**, | 4:16-cv-14028-TGB-APP |
| Plaintiff, | HON. TERRENCE BERG |
| vs. | **ORDER DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| **HENRY FORD HEALTH SYSTEM**, | |
| Defendant. | |

This is an employment discrimination and wrongful termination case. Plaintiff Vicki Bucciere was a master licensed social worker employed by defendant Henry Ford Health System ("HFHS") as an Employee Assistance Program ("EAP") counselor. In 2015, Plaintiff counseled a recently-terminated HFSH employee and wrote an email on his behalf to a supervisor. That email set into motion a series of events that led to Plaintiff's termination less than a month later. HFHS's proffered reasons for the termination are that Plaintiff practiced outside the scope of her professional license, overstepped the bounds of her job

1

description, violated company policy, and refused to cooperate with Human Resources in the wake of the email incident. But Plaintiff, who was 61 years old at the time of her termination, urges that age discrimination was the real reason for the adverse employment action. She therefore filed suit under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §630 *et seq*, and Elliot-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws §37.2202 *et seq*. She also claims wrongful termination in violation of Michigan public policy.

This case is now before the Court on Defendant's motion for summary judgment (ECF No. 35). Oral argument took place on January 9, 2019. After careful consideration of the briefs and thorough review of the extensive factual record, the Court finds Plaintiff has raised a genuine issue of material fact that Defendant's stated reasons for her termination were a pretext for unlawful age discrimination. Defendant's motion will thus be denied with respect to Plaintiff's age discrimination claims. The Court further finds that Defendant is entitled to summary judgment on Plaintiff's wrongful termination claim.

## BACKGROUND

Vicki Bucciere began working for HFHS on February 24, 1997, as a social worker.  In 2003, she became a counselor with the Employee Assistance Program ("EAP").  Def.'s Mot. for Summ. J., Ex. 3, ECF No. 35-4 (Plaintiff's Resumé).  The EAP provides HFHS employees and their families with short-term counseling on a variety of "personal and work related issues" including "co-worker or supervisor conflicts," stress management, depression, harassment, and addiction.  Pl.'s Resp. to Mot. for Summ. J., Ex. 7, 8, ECF Nos. 35-8, 35-9 (EAP Brochures).

Until the December 2015 incident that led to her termination, Plaintiff's disciplinary record was essentially unblemished. A 2014 performance review describes her as a "role model, leader and change agent" as well as "[h]ighly professional, courteous and responsive to the needs of others."  Pl.'s Ex. 4 at PageID.1016, ECF No. 40-5. Her immediate supervisor, Brenda Szalka, testified that she had no issues with Plaintiff's performance as a counselor, though she had "been coaching her on a few things."  Pl.'s Ex. 2 at PageID.905, 908–909, ECF No. 40-3 (Szalka Dep.).  The only other disciplinary incident of note occurred two months before Plaintiff sent the email that resulted in her

termination. In an employee's medical records, she documented a statement by the employee's supervisor that he was "no fan of the employee." *Id.* at PageID.912–913; Pl.'s Ex. 1 at PageID.772–73, ECF No. 40-2. Szalka considered documentation of that comment inappropriate; it was later used by the employee in a lawsuit against HFHS. Pl.'s Ex. 2 at PageID.913; Pl.'s Ex. 1 at PageID.775–76. This incident led Szalka to "verbal[ly] discipline" Plaintiff. *See* Pl.'s Ex. 2 at PageID.912–913.

The event that precipitated Plaintiff's termination was a one-hour counselling session with a recently-terminated employee, "Mr. A," on December 8, 2015. Pl.'s Ex. 1 at PageID.794. Mr. A, who was going through the termination appeal process, asked Plaintiff to write a letter to a supervisor on his behalf. *Id.* at PageID.804. At that time Plaintiff did not know HFHS had terminated Mr. A for repeated acts of misconduct, including sexual harassment. *Id.* at PageID.805. As requested, following the counselling session Plaintiff sent an email to Deborah Holmes, Mr. A.'s supervisor, explaining that Mr. A was "quick to acknowledge and to take full responsibility for his workplace wrongdoing" and "verbalized a tremendous sense of grief and remorse."

Def.'s Ex. 13 at PageID.527, ECF No. 35-14. She further stated, "[i]n reevaluating the circumstances of Mr. A['s] dismissal via the appeals process, I would like to request that you view his poor judgment as a mistake to be learned from." *Id.* Holmes forwarded this email to La'Trise Smith, an HFHS Human Resources Business Partner, and it was also later sent to Plaintiff's supervisor, Szalka, and to Noel Baril, HFHS Human Resources Vice President. *Id.* Mr. A received a copy of the email as well. *See* Pl.'s Ex. 36 at PageID.1414, ECF No. 40-37 (Smith Dep.).

Almost immediately after reading the email, Smith phoned Plaintiff to explain that she found it "concerning." *Id.* at PageID.1414–17. Smith felt Plaintiff's thoughts about termination "should not have been presented in a written format and given to [Mr. A]," even if she was expressing her clinical opinion. *Id.* Baril, the Human Resources Vice President, also worried about "the risk that [Plaintiff's] lack of collaboration creates in the event there is an action on the part of this former employee." Def.'s Ex. 13 at PageID.525. Szalka likewise found the email "unprofessional and inappropriate" but she acknowledged Plaintiff's intentions were pure: "Vicki is so passionate about helping employees and trying to do all that she can to assist and support." *Id.*

On December 14, 2015, less than one week after Plaintiff sent the email on Mr. A's behalf, HFHS suspended her. Szalka broke the news, explaining that Plaintiff was being suspended because the email was "outside the scope of practice," "outside of our role and responsibility," and "something that we do not practice in EAP." Pl.'s Ex. 2 at PageID.931–32. That same day, Plaintiff emailed Szalka thanking her for "taking the time to meet . . . to review events supporting the decision to suspend [her] employment." Def.'s Ex. 16, ECF No. 35-17. Plaintiff expressed surprise that her conduct had violated any Human Resources or EAP policy. *Id.; see also* Pl.'s Ex. 2 at PageID.932–33 (confirming that Plaintiff's conduct had not violated any written policy). But she promised to "never again write a letter of advocacy or support for a terminated employee entering into the appeals process" and "sincerely apologize[d] for any negative impact" her actions had on the Human Resources department. Def.'s Ex. 16.

After suspending Plaintiff, HFHS determined that her conduct was a Group II violation under HFHS's Corrective Action Policy, which governs consequences for employee misconduct. The policy separates forms of employee misconduct into Group I and Group II violations, the

latter being more serious and warranting immediate termination. Pl.'s Ex. 17 at PageID.1161, ECF No. 40-18; Pl.'s Ex. 37 at PageID.1471. Specifically, Szalka and Harrington-Davis determined that Plaintiff's conduct was a Group II violation, falling under sub-heading "B": "[g]ross inattention to duties which can potentially endanger or harm patients, customers or employees, or put the organization in a position of liability." Pl.'s Ex. 17 at PageID.1165; Pl.'s Ex. 2 at PageID.951–54; Pl.'s Ex. 3. at PageID.999–1002 (Bacigal Dep.). This decision was partly influenced by information Harrington-Davis received in a phone call to the Michigan Department of Licensing and Regulatory Affairs (LARA). *See* Pl.'s Ex. 23. According to Harrington-Davis's testimony, a LARA employee confirmed that Plaintiff's conduct amounted to practicing outside the scope of her license and the LARA employee provided her with "the language" to describe Plaintiff's actions as a license violation. Pl.'s Ex. 37 at PageID.1462–63.

Despite Plaintiff's apology and the fact that the email on behalf of Mr. A was her only serious instance of misconduct, HFHS terminated her on January 4, 2016. Szalka, Bacigal, Smith, and Jan Harrington-Davis, HFHS's System Director for Employee Labor Relations, Workforce

Diversity, and Employee Compliance, were all involved in making the decision. Pl.'s Ex. 2 at PageID.949–53; Pl's Ex. 37 at PageID.1456–60. They reviewed Plaintiff's file, met with one another, and consulted HFHS's Corrective Action Policy to make the decision. Pl.'s Ex. 2 at PageID.949–53; Pl.'s Ex. 37 at PageID.1456–60. Sometime between December 17 and 20, 2015, Szalka, Bacigal, and Harrington-Davis also participated in a legal review meeting with HFHS's termination committee. Pl.'s Ex. 2 at PageID.957–60. That meeting confirmed their decision to terminate Plaintiff. *Id.*; *see also* Pl.'s Ex. 18, ECF No. 40-19 (Dec. 17, 2015 email from Szalka to Harrington-Davis). HFHS ultimately produced a formal memorandum documenting Plaintiff's termination.[1] That memorandum stated that Plaintiff's email on behalf of Mr. A demonstrated "[f]ailure to stay within the scope as a licensed professional . . . a Group II violation under our corrective action policy as well as an infraction to Section 333.18101 of the MI Counselor Licensure Law" that warranted termination. Pl.'s Ex. 23.

---

[1] The memorandum is undated, and the record contains no evidence establishing when exactly it was prepared.

At the time of her termination, Plaintiff was 62—the oldest employee in her department by a significant margin. Pl.'s Ex. 1 at PageID.704–05. Her colleagues ranged in age from early-forties to late-forties, with the oldest being around 50 years old. *Id.* at PageID.705.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party has the initial burden of demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). On a motion for summary judgment, the Court must view the evidence and any reasonable inferences drawn from the evidence in the light most favorable to the non-

moving party. *Matsushita*, 475 U.S. at 587 (citations omitted); *Redding v. St. Edward*, 241 F.3d 530, 531 (6th Cir. 2001).

The trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). The Court must then determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to the trier of fact or whether the moving party must prevail as a matter of law. *See Anderson*, 477 U.S. at 252.

## DISCUSSION

Material issues of fact preclude summary judgment on Plaintiff's claims for age discrimination under the ADEA and Michigan ELCRA. Having examined the evidentiary record, the Court finds that a reasonable jury could credit Plaintiff's version of events, which is that she was terminated because of age discrimination. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354 (6th Cir. 1998).

Accordingly, summary judgment on Plaintiff's age discrimination claims in favor of HFHS is not appropriate. HFHS is, however, entitled to summary judgment on Plaintiff's claim for wrongful termination in violation of Michigan public policy.

## A. Age Discrimination

The ADEA prohibits an employer from discharging an individual "because of such individual's age." 29 U.S.C. § 623(a)(1). Michigan's ELCRA similarly requires employers not to terminate or otherwise discriminate against any employee "because of . . . age." Mich. Comp. Laws § 37.2202(1)(a). Age discrimination claims brought under the ELCRA are analyzed under the same standards as federal claims brought under the ADEA. *Geiger v. Tower Auto.*, 579 F.3d 614, 626 (6th Cir. 2009) (citation omitted).

A Plaintiff may establish violation of the ADEA through either direct or circumstantial evidence. *See Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008). "Direct evidence of discrimination is evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Geiger*, 579 F.3d at 620 (citing *Wexler v. White's Fine*

*Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (*en banc*)). In contrast, circumstantial evidence is evidence that "does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Id.* Whatever the type of evidence used to prove age discrimination, the Supreme Court reiterated in *Gross v. FBL Financial Services, Inc.* that an ADEA Plaintiff retains the ultimate burden of persuasion and must establish that age was the "but-for" cause of the adverse employment action. 557 U.S. 167, 177 (2009). While the defendant at no point carries the burden of persuasion, the burden of *production* shifts between litigants as the analysis unfolds. *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 812 (6th Cir. 2011).

### 1. *Prima Facie* Case

The Sixth Circuit has long used the *McDonnell Douglas* framework to analyze ADEA claims where, as here, the Plaintiff has presented only circumstantial evidence. *Geiger*, 579 F.3d at 621 (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) and *Laugesen v. Anaconda Co.*, 510 F.2d 307, 317 (6th Cir. 1975)). Under this framework, the Plaintiff first must establish a p*rima facie* case of age discrimination by producing evidence of the following four elements: (1) membership in

a protected group (i.e. persons 40 years of age or over); (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination." *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002)); *see also Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 394 (6th Cir. 2008) (explaining that individuals over 40 years of age are a protected class for ADEA purposes). A plaintiff can establish the fourth factor, circumstances that support an inference of discrimination, by showing she was replaced by a significantly younger individual. *See Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003). Age differences of ten or more years have generally been held significant enough to meet this fourth element. *See, e.g., Barnett v. Dep't of Veterans Affairs,* 153 F.3d 338, 340–41 n.3 (6th Cir. 1998) (finding replacement of 51-year-old by employee "around 40" sufficient); *Bush v. Dictaphone Corp.,* 161 F.3d 363, 368 (6th Cir. 1998) (determining that replacement of 46-year-old by 32-year-old was enough to support an inference of discrimination).

It is undisputed that Plaintiff has met the first three prongs of her *prima facie* case of age discrimination. Def.'s Br. in Supp. of Mot. for

Summ. J. ("Def.'s Br.") at PageID.405, ECF No. 35. She was 61 years old when HFHS terminated her employment (an adverse employment action). Pl.'s Ex. 1 at PageID.704–05. And it is uncontroverted that she was well-qualified to be an EAP counselor. Def.'s Br. at PageID.405. HFHS maintains Plaintiff cannot meet the fourth prong of her *prima facie* case, which requires demonstrating circumstances that support an inference of discrimination. *Id.* But the employee HFHS replaced Plaintiff with, Geri Iaconis, was 47 years old—14 years her junior—at the time of Plaintiff's termination. Def.'s Ex. 23 at PageID.612. Under Sixth Circuit precedent, HFHS's replacement of Plaintiff with a significantly younger employee is more than sufficient to establish the fourth element of her *prima facie* case. *Grosjean*, 349 F.3d at 336 ("Age differences of ten or more years have generally been held to be sufficiently substantial to meet the requirement of the fourth part of age discrimination prima facie case.") (citations omitted). Plaintiff has thus established all four elements of her *prima facie* case.

### 2. Legitimate nondiscriminatory reasons.

Once a Plaintiff establishes her *prima facie* case, the burden of production shifts to the employer to articulate a "legitimate

nondiscriminatory reason for the adverse employment action."
*Ercegovich*, 154 F.3d at 350; *see also Reeves v. Sanderson Plumbing
Products, Inc.*, 530 U.S. 133, 142 (2000) (the burden to articulate a
legitimate, nondiscriminatory reason for the adverse employment action
is one of production, not persuasion, and "can involve no credibility
assessment.") (citation omitted). That reason must be "clear,"
"reasonably specific," and "anchored in the facts." *Lewis v. City of Detroit*,
702 F. App'x 274, 283 (6th Cir. 207) (citing *Tex. Dep't of Cmty. Affairs v.
Burdine*, 450 U.S. 248, 254–55 (1981)); *Clay v. United Parcel Serv., Inc.*,
501 F.3d 695, 713 (6th Cir. 2009). Here, defendant has satisfied its
burden of production by listing several legitimate, nondiscriminatory
reasons for Plaintiff's termination:[2]

1. Plaintiff "practiced outside of her scope as a licensed
   counselor." Pl.'s Ex. 23.
2. Her conduct was a Group II violation under HFHS's
   Corrective Action Policy. *Id.*
3. Plaintiff's "actions fell outside of the role and scope of EAP
   therapist." Pl.'s Ex. 16.

---

[2] Plaintiff focuses on the reason set forth in Defendant's undated
termination memorandum, which is that she "practiced outside of her
scope as a licensed counselor." Pl.'s Ex. 23. But a formal termination
memorandum "is not the only evidence a court may use to determine the
reasons for an employee's dismissal." *Blizzard*, 698 F.3d at 284–5
(citation omitted).

4. She "externalized the situation" and refused to acknowledge to HR that she had done anything wrong. *Id.*

Whether these reasons are anchored in the evidentiary record, or potentially pretext for age discrimination, is a more difficult and close question.

### 3. Pretext

Once the employer provides a legitimate, nondiscriminatory reason for the adverse employment action, the burden of production returns to the plaintiff, who must then "show that the employer's nondiscriminatory explanation is mere pretext for intentional age discrimination." *Ercegovich*, 154 F.3d at 350. Essentially, at this stage the plaintiff must produce "sufficient evidence from which a jury could reasonably reject the employer's explanation of why it fired her." *Blizzard*, 698 F.3d at 285 (internal punctuation omitted) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). A plaintiff can do this by demonstrating that the employer's proffered reason: (1) has no basis in fact; (2) did not actually motivate the employer's challenged conduct; or (3) was insufficient to warrant the challenged conduct. *Wexler*, 317 F.3d at 576 (citing *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)). This third method of establishing pretext ordinarily entails showing that

"other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the Plaintiff." *Allen*, 545 F.3d at 396. In this final step of the *McDonnell Douglas* framework, the plaintiff's burden to show pretext "merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Provenazo*, 663 F.3d at 812 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). The Court will separately analyze each of defendant's legitimate, nondiscriminatory reasons for termination and assess whether Plaintiff has presented evidence demonstrating a genuine issue of fact as to whether those reasons were mere pretext for age discrimination.

      a. *Plaintiff "practiced outside of her scope as a licensed counselor."*

One of Defendant's proffered reasons for Plaintiff's termination is her alleged "[f]ailure to stay within the scope as a licensed professional" in violation of "Section 333.18101 of the MI Counselor Licensure Law." Pl.'s Ex. 23. That rationale appeared in the employer's formal termination memorandum and in a January 6, 2016 email from Harrington-Davis to Plaintiff. Pl.'s Ex. 28, ECF No. 40-29 (explaining

that she is being terminated for "[p]racticing outside of scope for licensed professionals."). Viewing the record in the light most favorable to Plaintiff, there is evidence that a jury could rely on to "reasonably disbelieve" this explanation. Defendant was aware that Plaintiff was a licensed master social worker (not a licensed counselor) before her termination, but nevertheless gave as its reason Plaintiff's exceeding the scope of a licensed counselor. *Bartlett v. Gates*, 421 F. App'x 485, 492 (6th Cir. 2010) (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008)).

Between Plaintiff's December 14, 2015 suspension and January 4, 2016 termination, Harrington-Davis emailed Szalka and Bacigal, stating "I see [Plaintiff] has a MSW [master's in social work], is she a licensed counselor?" Pl.'s Ex. 19, 20, ECF Nos. 40-20, 40-21. Bacigal responded that Plaintiff was a "[l]icensed social worker." Pl.'s Ex. 20. And Szalka confirmed that she "holds a LMSW [Licensed Master Social Worker]." Pl.'s Ex. 19. These emails would allow a finding that HFHS understood Plaintiff was a licensed master social worker, not a licensed counselor,

when they terminated her.[3] *See also* Pl.'s Ex. 9, ECF No. 40-10 (Plaintiff's License Verification). Her duties and scope of practice were thus defined by a different and broader statute, Mich. Comp. Laws § 333.18501. Pl.'s Ex. 37 at 19:2–20:11. On its face, this statute does not prohibit a master social worker from advocating on behalf of a client to a supervisor. Rather, it broadly defines the scope of practice as "advanced application of the knowledge of human development and behavior and social, economic, and cultural institutions." Mich. Comp. Laws § 333.18501. Further, a tool on LARA's website "intended as a guide to assist people in understanding" the functions of different types of social workers explains that licensed master social workers are responsible for "Advocacy for individual" and "Advocacy for group/communities." Pl.'s Ex. 34. Plaintiff has thus presented evidence creating a material issue of fact as to whether Defendant's rationale that Plaintiff violated the scope of her professional license was the genuine reason for her

_____

[3] Around this time, Harrington-Davis called LARA to inquire about whether Plaintiff's email constituted any kind of professional license violation. Pl.'s Ex. 37 at PageID.1462–64. But it is unclear what type of license Harrington-Davis was inquiring about. The memorandum and Harrington-Davis's email, however, referenced the type of license not applicable to Plaintiff.

termination. Together with the conspicuous absence of any LARA documentation supporting Defendant's allegation of a license violation, this evidence is sufficient to suggest Defendant's stated explanation for the termination was pretextual and has no basis in fact.

   b. *Plaintiff's conduct was a Group II violation under HFHS's Corrective Action Policy.*

   A related nondiscriminatory termination reason HFHS provided is that Plaintiff's conduct constituted a Group II violation under its Corrective Action Policy. *See* Pl.'s Ex. 23. The termination memorandum, for example, reasons that "[f]ailure to stay within the scope as a licensed professional is a Group II violation under our corrective action policy." *Id.* This rationale has already been discussed; Plaintiff has presented evidence creating a material issue of fact as to whether she committed any type of license violation. As will be discussed below, Plaintiff has also produced evidence raising a question of fact as to whether Defendant's characterization of Plaintiff's conduct as a Group II violation was pretextual.

   As an initial matter, considering the types of egregious misconduct that qualify as Group II violations, HFHS's decision to categorize an EAP counselor's single email advocating on behalf of a terminated employee

as a Group II violation appears questionable and arguably pretextual. The infractions listed under the policy's Group II heading are much more serious than Plaintiff's and include embezzlement, fraud, assault, selling drugs, and abuse of patients or other employees. *See Id.* at PageID.1164–65. Had HFHS categorized Plaintiff's email as a Group I violation—"[u]nprofessional conduct," for example—she would have been subject to "progressive corrective action steps described within the policy," beginning with formal documented counseling. *Id.* at PageID.1161. Instead, by characterizing Plaintiff's email as a Group II violation, HFHS bypassed any need to afford Plaintiff the opportunity to respond to progressive corrective action steps and leapt immediately to termination. This is because under the Corrective Action Policy, even "a single incident" under Group II justifies termination. *Id.* at PageID.1161–62.

An email Szalka sent Baril and Smith on December 11, 2015, a few days before Plaintiff's suspension, suggests HFHS did not then consider her email to represent "[g]ross inattention to duties which can potentially endanger or harm patients, customers or employees, or put the organization in a position of liability" as required under Group II. At that time, Szalka wrote:

"Vicki is so passionate about helping employees and trying to do all that she can to assist and support that she sometimes puts herself in situations such as this. Her intentions are good but she doesn't always understand the bigger picture . . . . What bothers me most about this situation is that she asked Latrice [Smith] to put her expectations in writing. That was unprofessional and inappropriate."

Pl.'s Ex. 17 at PageID.1165.  Pl.'s Ex. 13 at PageID.1079. This email shows Szalka found Plaintiff's conduct well-meaning, if overzealous. Her biggest concern about the incident was Plaintiff's attitude towards Smith, an HFHS Human Resources Business Partner. Nowhere in this email exchange do Szalka, Baril, or Smith express any concern about potential harm to any HFHS patients, customers, or employees.[4]

Yet, when prompted to explain exactly how Mr. A suffered harm or was put in danger by Plaintiff's actions, Szalka simply reiterated that "by writing a letter of advocacy for [Mr. A], that was not what our role—what [Plaintiff's] role should have been." Pl.'s Ex. 2 at PageID.928–29.  She also suggested that Plaintiff's conduct had not harmed HFHS; only Plaintiff's relationship with Human Resources.  *Id.* at PageID.929. Indeed, as it currently stands, the record contains no evidence

---

[4] Defendant had expressly stated that Plaintiff was not terminated for exposing it to potential legal liability.  Pl.'s Ex. 37 at PageID.1470.

demonstrating that Plaintiff's email harmed or endangered Mr. A or HFHS. Based on the foregoing, Plaintiff has raised a genuine issue of fact that Defendant's decision to categorize her conduct as a Group II violation was pretextual.

        c.   *Her "actions fell outside of the role and scope of EAP therapist."*

Yet another legitimate, nondiscriminatory reason Defendant provided for the termination is that Plaintiff's "actions fell outside of the role and scope of an EAP therapist." Pl.'s Ex. 16 (Termination Talking Points). When HFHS suspended Plaintiff, Szalka told her it was because she had acted "outside the bounds of [her] job" as an EAP counselor by sending the email on behalf of Mr. A. Pl.'s Ex. 1 at PageID.818–821. Talking points Szalka prepared for the January 4, 2016 termination meeting reiterated that Plaintiff's "actions fell outside of the scope of EAP therapist and could be terminable." Pl.'s Ex. 16; *see also* Pl.'s Ex. 2 at PageID.929–30 (explaining that the role of an EAP counselor is only to provide support and counseling to clients—not advocacy). But viewing all the evidence in the record, there is a question of fact as to whether the email sent by Plaintiff violated the boundaries of her EAP counselor role.

Defendant has admitted it had no written policy prohibiting Plaintiff from writing a letter of advocacy on behalf of a patient. Pl.'s Ex. 2 at PageID.932–33. Further, a pamphlet publicizing HFHS's EAP lists "Co-worker or supervisor conflicts" among the workplace issues EAP counselors are permitted to support employees in trying to address. Pl.'s Ex. 7 at 3. The brochure goes on to explain that EAP counselors will support employees "throughout the process—from helping you define the issue and find practical solutions to follow-up." *Id.* at 2. The Court finds this evidence indicates a triable issue of fact as to whether Plaintiff's email "fell outside" the proper bounds of her role as an EAP counselor.

Moreover, the content of Plaintiff's email on behalf of Mr. A does not appear to step outside the bounds of assisting with supervisor conflicts. Plaintiff never suggests that Mr. A was unjustifiably terminated, or that he should be reinstated. Pl.'s Ex. 13. Rather, the email summarizes Plaintiff's discussion with Mr. A, explains that he "was quick to acknowledge and to take full responsibility for his workplace wrongdoing" and asks that "[i]n reevaluating the circumstances of Mr. A's dismissal . . . [Mr. A.'s supervisor] view his poor judgment as a mistake to be learned from . . . and as an opportunity for Mr. A to

recommit to the workplace values espoused by the HFHS." *Id.* A reasonable jury could find that this email was not in conflict with her EAP counselor role, and therefore that Defendant's proffered termination reason was pretextual.

### d. *Plaintiff "externalized the situation" and refused to acknowledge to HR that she had done anything wrong.*

Another non-discriminatory reason offered by Defendant for Plaintiff's termination is that Plaintiff failed to "take ownership of wrong-doing" and instead "externalized the situation making reference to the lack of an EAP policy." Pl.'s Ex. 16. This explanation was the one initially identified by Szalka, Smith, and Baril leading up to Plaintiff's suspension. In response, Plaintiff has produced evidence calling into question whether this rationale was the real reason behind Plaintiff's termination.

After reading Plaintiff's email on behalf of Mr. A, Smith spoke with Plaintiff and then reported on that conversation to Szalka and Baril. Pl.'s Ex. 13 at PageID.1080. Smith wrote that Plaintiff "doesn't agree with my approach or recommendation and wanted me to put something in writing to state how they should handle these situations going forward." *Id.* In response, Baril expressed concern about the "risk that this lack of

collaboration creates in the event there is an action on the part of this former employee." *Id.* at PageID.1079. Szalka specifically took issue with Plaintiff's request for a written explanation of how she should have handled the situation with Mr. A. *Id.* That aspect of the email incident was what "bother[ed] [Szalka] most about this situation." *Id.*

Yet viewing the record a whole, a jury could conclude that Plaintiff's interactions with Human Resources in the wake of the Mr. A email were reasonable. Plaintiff expressed surprise that a single email had resulted in her suspension, especially because there was no HFHS policy about writing a letter or email on behalf an EAP client. *See* Pl.'s Ex. 15; Pl.'s Ex. 2 at PageID.929–30 (confirming there was no HFHS policy prohibiting EAP counselors from writing an email advocating for a client). And Plaintiff apologized for her conduct, assuring Szalka that she would "never again write a letter of advocacy or support for a terminated employee entering into the appeals process." Pl.'s Ex. 15. Based on the lack of written policy, and the apology produced by Plaintiff, a reasonable jury could infer that her request for written guidance on how to handle this type of situation going forward was not the real reason for her termination.

At bottom, Defendant has provided a number of explanations for its decision to terminate Plaintiff. While they may be legitimate, the jury might doubt them where the record as a whole discloses that an employee of 21 years with an overall positive work record was terminated for sending a single email that her supervisor initially felt was motivated by compassion for her client and a good faith effort to "do all that she can to assist and support." Pl.'s Ex. 13 at PageID.1079. The Sixth Circuit has commented that "an employer's strategy of simply tossing out a number of reasons to support its employment action in the hope that one of them will 'stick' could easily backfire" where, as here, the sheer numerosity of explanations may itself suggest the employer's stated termination reasons were pretextual. *Shrivastava v. RBS Citizens Bank, N.A.*, 227 F.Supp.3d 824, 835–36 (E.D. Mich. 2017) (internal punctuation omitted) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 809 (6th Cir. 1998)); *see also Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 541 (6th Cir. 2014) (explaining that shifting justifications for a termination decision "raise an inference that the proffered reasons are false and are pretext for discrimination.")

In addition to the reasons above that might cause the fact-finder to question Defendant's business reasons in support of the termination decision, Plaintiff has offered some circumstantial evidence of potential age discrimination that tips the scale in favor of denying summary judgment. Less than six months before her termination, Szalka, Plaintiff's immediate supervisor, wrote an email describing Plaintiff as "confused at times" and "forgetful." Pl.'s Ex. 6, ECF No. 40-7. The email also vented that Plaintiff "has to be reminded many times over of certain things" and characterized her as "in la-la land." *Id.* Under Sixth Circuit precedent, because these comments were made by an HFHS employee centrally involved in the decision to terminate Plaintiff mere months before the adverse employment action took place, they may be viewed as circumstantial evidence of age discrimination. *See Ercegovich*, 154 F.3d at 354–55 (explaining that discriminatory remarks are only indicative of age discrimination if made by an employee involved in making the challenged employment decision). Whether these comments are circumstantial evidence indicative of age discrimination is a triable issue of fact properly left to a jury.

In terms of circumstantial evidence of age discrimination, Plaintiff also alleges that another EAP Counselor several decades her junior committed a perhaps more serious professional license violation but was not terminated or even seriously disciplined as a result. That employee, Shelly Harlen, was in her mid-30's when she allowed her master social worker license to lapse, making it impossible for her to legally counsel patients. Pl.'s Ex. 1 at PageID.709–11; *see also* Pl's Ex. 30, 31, ECF Nos. 40-31, 40-32 (LARA License Verifications). Unfortunately, the record contains no evidence of whether Harlen counseled HFHS patients while her license was expired, which would certainly be a license violation of greater magnitude than the one Defendant accused Plaintiff of committing. Based on the existing record, Plaintiff has thus failed to show that Harlen was "similarly situated with respect to the severity and frequency of her performance errors." *Blizzard*, 698 F.3d at 287 (internal punctuation omitted) (quoting *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1116 (6th Cir. 2001)).

The Sixth Circuit warns courts to "exercise caution in granting summary judgment for the Defendant once the Plaintiff has made a prima facie case and a showing of pretext because 'an employer's true

motivations are particularly difficult to ascertain, thereby frequently making such factual determinations unsuitable for disposition at the summary judgment stage.'" *Moffat v. Wal-Mart Stores, Inc.*, 624 F. App'x 341, 348 (6th Cir.) (*per curiam*) (quoting *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 564 (6th Cir. 2004)). Here, Plaintiff successfully supported her *prima facie* case. Examining the record as a whole, the Court also finds that she has produced evidence that calls into question Defendant's proffered reasons for her termination. *See Griffin v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir. 2012) (At the summary judgment stage, Plaintiff need not disprove—only rebut—the employer's stated rationales). Because ADEA and ELCRA claims are analyzed under the same evidentiary standards, Plaintiff has also presented evidence sufficient to survive summary judgment on her claim for age discrimination under the ELCRA. *See Dekarske v. Fed. Exp. Corp.*, 294 F.R.D. 68, n.2 (E.D. Mich. 2013) (Borman, J.) (citing *Geiger*, 579 F.3d at 626). Consequently, the motion for summary judgment with respect to these claims must be denied.

## B. Wrongful Termination

Defendant also seeks summary judgment on Plaintiff's claims for wrongful termination in violation of Michigan public policy. Application of governing law to the record demonstrates defendant is entitled to summary judgment on these claims.

Although an "at will" employee can ordinarily be terminated by an employer at any time, for any reason, under Michigan law a discharged employee can sue if her termination was "so contrary to public policy as to be actionable." *Goldfaden v. Wyeth Lab., Inc.*, 482 F. App'x 44, 50 (6th Cir. 2012) (citing *Suchodolski v. Mich. Consol. Gas Co.*, 412 Mich. 692, 316 N.W.2d 710, 711 (Mich. 1982) (*per curiam*)). A claim for wrongful termination in violation of Michigan public policy may rest on one of three grounds: (1) "the employee is discharged in violation of an explicit legislative statement prohibiting discharge of employees who act in accordance with a statutory right or duty"; (2) "the employee is discharged for the failure or refusal to violate the law in the course of employment"; or (3) "the employee is discharged for exercising a right conferred by a well-established legislative enactment." *Id.* (quoting *Edelberg v. Leco Corp.*, 236 Mich. App. 177, 599 N.W.2d 785, 786–87

(Mich. Ct. App. 1999)). Plaintiff seeks relief only based on the second ground.

To show she was discharged for failing or refusing to violate the law, a Plaintiff "need not show that the employer directed her to violate the law." *Morrison v. B. Braun Med. Inc.*, 663 F.3d 251, 257 (6th Cir. 2011). But she must set forth facts that create a "nexus between the laws and regulations and her own termination for exercising a right guaranteed by law, executing a duty required by law, or refraining from violating the law." *Giron v. Tyco Elec. Corp.*, No. 2:16-cv-11803, 2016 WL 7405805, at *1 (E.D. Mich. Dec. 22, 2016) (Murphy, J.) (internal punctuation omitted) (citing *Shaughnessy v. Interpublic Grp. of Cos., Inc.*, 506 F. App'x 369, 377 (6th Cir. 2012)).

Critically, Plaintiff has not presented evidence that she was terminated for refusing or failing to violate any Michigan public policy. The specific statutes she alleges she was terminated for refusing to violate are: (1) Mich. Comp. Laws § 333.18511, which provides that a licensed social worker shall not perform any task unless it "is consistent with the code of ethics for social workers"; and (2) Mich. Comp. Laws § 333.16213, which requires licensed public health professionals to "keep

and maintain a record for each patient" they provide services to, including "a full and complete record of tests and examinations performed, observations made, and treatments provided."[5]

Plaintiff has no claim stemming from her purported refusal to violate Mich. Comp. Laws § 333.18511 because the code of ethics that statute references is the one established by the National Association of Social Workers, a private association. "The code of ethics of a private association does not establish a public policy" and thus cannot form a basis for a claim for wrongful termination in violation of Michigan public policy. *Suchodolski*, 316 N.W.2d at 698.

Nor has Plaintiff presented evidence that she was terminated because she refused to violate Mich. Comp. Laws § 333.16213, the statute requiring licensed healthcare professionals to maintain medical records for each patient they treat. In support of this claim, Plaintiff refers to the 2015 incident in which Szalka verbally disciplined her for documenting a

---

[5] Plaintiff's Amended Complaint also suggests she has a claim for termination in violation of public policy based on Mich. Comp. Laws § 333.18501(f)(ii). But that statute governs the practice of social work at the bachelor's level; it is undisputed Plaintiff was a licensed master social worker. Her conduct would thus be governed by a different provision of that law, Mich. Comp. Laws § 333.18501(g).

statement by an employee's supervisor that was later used in a lawsuit against Defendant.  Pl.'s Br. at PageID.648; Pl.'s Ex. 2 at PageID.912–913; Pl.'s Ex. 1 at PageID.772–73, 776–75.  Setting aside the question of whether Mich. Comp. Laws § 333.16213 required Plaintiff to document the supervisor's comment (which is far from clear), Plaintiff has not presented evidence of any nexus between her decision to document the supervisor's comment and Defendant's decision to terminate her. Defendant has specifically stated Plaintiff was not fired for creating potential liability, and Plaintiff has not presented any evidence to the contrary.[6]  Pl.'s Ex. 37 at PageID.1470.  Defendant is therefore entitled to summary judgment on this claim, as there is no genuine issue of material fact in conflict.

## CONCLUSION

For the reasons explained herein, defendant Henry Ford Health System's motion for summary judgment is **DENIED** with respect to Plaintiff Vicki Bucciere's claims for age discrimination under the ADEA (Count I) and Michigan ELCRA (Count II), and **GRANTED** as to

---

[6] For these same reasons, any claim Plaintiff may have stated alleging she was discharged for exercising a right conferred by Mich. Comp. Laws § 333.16213 necessarily fails.

34

Plaintiff's claims for wrongful termination in violation of Michigan public policy (Count III).

**SO ORDERED.**

Dated: February 4, 2019       s/Terrence G. Berg
TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE

## Certificate of Service

I hereby certify that this Order was electronically submitted on February 4, 2019, using the CM/ECF system, which will send notification to all parties.

s/A. Chubb
Case Manager